(155 App. Div. 475.)

### COLLIGAN v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. February 21, 1913.)

1. EVIDENCE (§ 598*)—WEIGHT—WRITING AS PREPONDERATING.

   Written records of actual measurements made by engineers required to keep such records in the course of sinking a shaft will prevail as evidence of such measurements over mere varying estimates by persons observing the work, in absence of testimony impeaching such records.

   [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2450–2452; Dec. Dig. § 598.*]

2. MASTER AND SERVANT (§ 107*)—SAFE PLACE OF WORK—CHANGE IN PLACE OF WORK.

   The rule that a master must use reasonable care to provide a reasonably safe place of work is not applicable where the place of work is

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

undergoing constant changes in the progress of the work, as in the sinking of a shaft.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. § 107.*]

Hirschberg and Rich, JJ., dissenting.

Appeal from Trial Term, Orange County.

Action by Rose M. Colligan, administrator of James H. Colligan, deceased, against the City of New York. From a judgment for plaintiff, and an order denying a motion for new trial, defendant appeals. Reversed, and new trial granted.

Argued before HIRSCHBERG, BURR, THOMAS, WOODWARD, and RICH, JJ.

Clarence L. Barber, of New York City (Terence Farley, of New York City, on the brief), for appellant.

R. H. Barnett, of Newburgh, for respondent.

WOODWARD, J. The plaintiff's intestate was one of a gang of 12 or 15 men engaged in the construction of a shaft in connection with the Catskill waterworks at Cornwall, N. Y., on the 10th day of January, 1911, and at about 10 o'clock in the evening of that day, about two hours before the end of the eight-hour shift, he was struck on the head by a falling stone from the side of the shaft and fatally injured. This stone weighed several hundred pounds, and the fall was due to a cause which is not explained. It appears that during the year that this shaft had been under construction prior to the accident stones of various sizes had from time to time shot out from different points in the shaft, sometimes from the bottom and at other times from the sides, accompanied by loud noises like the report of a pistol, or more or less heavy blasts. These pieces of stone would, without any warning, suddenly blow out from the face of the rock, leaving a whitish powder to indicate the point at which they had severed from the granite rock through which the shaft was being constructed, but no amount of examination appears to have disclosed any sign by which their action could be anticipated. During the early stages of the work, the shaft appears to have been shored up or lined up with timbers, but, these proving ineffectual to protect the lives of those working below, the device was hit upon of using steel rings around the circle of the shaft, and bolting sheet steel to these rings and filling in the space between the jagged rock walls and the sheet steel with wood and other refuse. The drillers and muckers would work until the shaft had been sunk from 18 to 35 feet below the steel lining, when the drilling machinery would be removed, scaffolding would be constructed, and new sections of steel lining would be put in. These were carried down to within six to ten feet of the rough bottom of the shaft, and then the scaffolding was removed, the drills brought back down from the head of the shaft, and the drilling and blasting would go forward for 20 feet, more or less. The shaft at the time of the accident had reached a depth of about 1,070 feet, and was to reach a depth of 1,-150 at its completion. While the progress of the work varied, the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

average progress appears to have been at the rate of about 45 feet per month; practically one-half of this time being devoted to the work of putting in the protecting lining. The principal contention of the plaintiff is that the defendant was negligent in not having this lining placed so as to prevent the falling of this particular stone which hit her intestate and killed him. The distance from which the stone fell is uncertain. The witnessses vary in their estimates from 23 to 35 feet above the floor of the shaft, and the probabilities appear to be that it was in the neighborhood of 25 feet, for the evidence strongly preponderates that the steel sheeting was down to within 26 or 27 feet of the bottom of the shaft at the time of the accident, and no one suggests that the stone came from a point above the lowest point covered by the steel.

The theory on which this case has been presented is that the defendant had in prosecuting the work established the custom of lining down the shaft about once a week, and at a time when from 18 to 20 feet of the wall of the shaft was exposed below the lining, and the alleged negligence is predicated upon the alleged fact that the work at the time of the accident had been going forward for about two weeks, and that there was a distance of 25 to 35 feet between the bottom of the steel lining and the floor of the shaft, and there is some testimony in the case to the effect that the plaintiff's intestate, who was a foreman of the gang at work at the time of the accident, went to the defendant's timekeeper at about 8 o'clock in the evening of the day of the accident, and requested the timekeeper to telephone to one Harrison, the active superintendent of the work, and to say to him that all the men in the shaft were "kicking," and suggesting that the tools be withdrawn and the steel work be put in. It is claimed that the timekeeper conveyed this message, and that Harrison responded that they should go ahead with the group of holes then under way, and that he would see to it that the next shift put in the steel lining. Both Howard, the timekeeper, and Harrison, the superintendent, deny that any such conversation took place on the evening of the accident, and the credence to be given this story rests entirely upon the testimony of one Scott, to the effect that about two hours before the accident he heard Howard have a telephone conversation with Harrison, and that Howard said, " 'Mr. Colligan said he ought to have more steel in the shaft.' He said the men were kicking in the shaft," and that Harrison responded, " 'Get the line drilled up,' and he would see that the next shift put iron in, if it was finished." Just how Scott, assuming him to have been present with Howard, could be able to testify as to the response of Harrison, is not clear. Harrison says he had no such conversation. Scott does not testify that he was familiar with Harrison's voice, and that he identified it. He says Howard rang the telephone bell, and then waited, and that a voice called "Hello," and then he goes on to narrate what Howard said and what Harrison said in reply. Neither Howard nor Harrison are interested in a legal sense in this case, and, so far as this story entered into the consideration of the jury, it is unworthy of any serious consideration. It is proper, of course, for a person identifying a voice with which he is familiar to

testify to an admission, or to any material fact, but here there is nothing to show that the witness was familiar with Harrison's voice, or that he was in any position to hear the voice distinctly, and Howard says Scott was not present at any such conversation; that no such conversation took place, and Harrison is equally clear that he had no such conversation, and it is unthinkable that two men, in no wise impeached, having no personal interest in the matter, would commit perjury for the sake of saving a municipal corporation from liability in a case of this character. A verdict based upon any such testimony as this is so obviously against the weight of evidence that it should not be permitted to stand, and this conclusion is strengthened by the fact that Scott is not sure that he was not mistaken as to several of the details of the alleged acts of Howard in ringing the telephone, etc., while the undisputed evidence is that the telephone was so arranged that the witness could not have heard any bell in making a call upon Harrison at his home, he being located on a party line and the central office being called by merely removing the receiver.

[1] But upon the conditions existing in this shaft the overwhelming evidence is to the effect that the steel sheeting at the time of the accident was only about 26 feet from the bottom of the shaft, and that the distance above the floor of the shaft at the various times during the progress of the work when the drilling had been suspended to put in new lining varied from 17 to 32 feet by actual measurements as shown by the diaries kept by the engineers, who were called upon to keep these records, and it is well settled that measurements of this character must prevail over varying estimates, where there is nothing to impeach the testimony. Truesdell v. Erie Railroad, 114 App. Div. 34, 39, 99 N. Y. Supp. 694. These figures indicate an average of about 27 feet at the time of these several extensions, and in the case at bar the shield was only about 26 feet above the flooring, so that upon the point of the custom of making changes the evidence is against the contention of the plaintiff. No one claims that there was anything to indicate that this particular piece of rock was going to shoot out from the side. There is not a particle of evidence that there was anything to indicate any special danger from the conditions existing in the shaft at the time or just before the accident, and the story of the plaintiff's intestate leaving the shaft at 8 in the evening and going to make a complaint is decidedly improbable. But, if it be assumed to be true, it is not pretended that Harrison promised to do anything to change the lining until the next shift, some four hours later, and the testimony of Harrison is absolutely undisputed that he had instructed Colligan, plaintiff's intestate, to quit work at any time if there was danger to be apprehended from the continuation of the work, so that it must be clear that, if Colligan had not been satisfied to go on with the work up to the time of the next shift of men, he was at liberty to call a halt on the work.

[2] Of course, the common-law rule that the master must use reasonable care in providing a reasonably safe place in which the servant is to perform his work has nothing to do in a case of this kind, where the character of the place is undergoing constant change in the prog-

ress of the work. Citrone v. O'Rourke Eng. Cons. Co., 188 N. Y. 339, 80 N. E. 1092, 19 L. R. A. (N. S.) 340.

The judgment and order appealed from should be reversed and a new trial granted, costs to abide the event.

BURR and THOMAS, JJ., concur. HIRSCHBERG and RICH, JJ., dissent.